FILED
United States Court of Appeals
Tenth Circuit

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

April 25, 2022

Christopher M. Wolpert
Clerk of Court

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GASPAR LEAL,

    Defendant - Appellant.

No. 21-2003

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. Nos. 1:16-CR-03308-JB-2 &
1:16-CR-03069-JB-1)**
_____

Scott M. Davidson of Scott M. Davidson, Ph.D., Esq., Albuquerque, New Mexico, for Defendant-Appellant.

Tiffany L. Walters, Assistant United States Attorney, Office of the United States Attorney, District of New Mexico, Albuquerque, New Mexico (Fred J. Federici, Acting United States Attorney, with her on the briefs), for Plaintiff-Appellee.
_____

Before **HARTZ**, **HOLMES**, and **BACHARACH**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

    This appeal grew out of a drug case against Mr. Gaspar Leal. The case began when a confidential informant visited Mr. Leal and asked about

buying drugs. In response, Mr. Leal put the confidential informant in touch with several individuals, and the informant ultimately purchased methamphetamine twice from a third party (Daniel Carmona). These purchases led to Mr. Leal's conviction for conspiring to distribute at least 50 grams of methamphetamine. *See* 21 U.S.C. §§ 841(b)(1)(B), 846. The district court sentenced Mr. Leal to a prison term of 30 years.

Mr. Leal presents three appellate arguments:

1.   Insufficient evidence existed on Mr. Leal's knowledge of the drug type (methamphetamine) and quantity (at least 50 grams).

2.   The government acted outrageously when investigating Mr. Leal.

3.   The 30-year sentence was unreasonable because it far exceeded the sentences for more culpable codefendants and failed to account for Mr. Leal's mental illnesses.

We affirm the conviction and sentence based on three conclusions. First, the jury could reasonably find that Mr. Leal had known that the conspiracy involved at least 50 grams of methamphetamine. Second, Mr. Leal has not established that the government's conduct was clearly and obviously outrageous. Finally, the sentence was not substantively unreasonable: Mr. Leal's crime carried a mandatory minimum of ten years in prison, and the district court reasonably considered Mr. Leal's status as a career offender and his mental illnesses.

**I.     Sufficient evidence existed to convict for conspiracy to distribute at least 50 grams of methamphetamine.**

Mr. Leal challenges the sufficiency of the evidence regarding his knowledge of the drug type (methamphetamine) and quantity (at least 50 grams). We reject these contentions.

**A.     Our review is de novo.**

In addressing the sufficiency of the evidence, we engage in de novo review. *United States v. Yurek*, 925 F.3d 423, 430 (10th Cir. 2019). This review entails consideration of the evidence in the light most favorable to the government, and we reverse only if no reasonable factfinder could have found guilt beyond a reasonable doubt. *Id.* To find guilt beyond a reasonable doubt, the factfinder could rely on the evidence and reasonable inferences drawn from that evidence, but could not engage in "speculation" or "conjecture." *United States v. Arras*, 373 F.3d 1071, 1073–74 (10th Cir. 2004).

**B.     The evidence and reasonable inferences show Mr. Leal's knowledge that the sale would involve at least 50 grams of methamphetamine.**

To obtain a conspiracy conviction, the government needed to prove four elements:

1.     Mr. Leal and another person (excluding the confidential informant) agreed to violate the law.

2.     Mr. Leal had "knowledge of the essential objective of the conspiracy."

3

3.    Mr. Leal's involvement was "knowing and voluntary."

4.    "Interdependence" existed among Mr. Leal and the alleged coconspirators.

*United States v. Cushing*, 10 F.4th 1055, 1065 (10th Cir. 2021) (quoting *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000)), *cert. denied*, 142 S. Ct. 813 (Jan. 10, 2022).

Mr. Leal homes in on the second element, arguing that he acted only to facilitate the sale of marijuana (not methamphetamine) and didn't know how much the informant wanted to buy. But the jury could reasonably find Mr. Leal's knowledge that the sale would involve at least 50 grams of methamphetamine.[1]

**1.    The jury could reasonably find participation in the conspiracy based on Mr. Leal's phone calls.**

While Mr. Leal was in prison on other charges, he called the informant and told him to contact Mr. Jose Casillas. The informant then called Mr. Casillas, but that call didn't result in a sale: Mr. Casillas said that he sold only marijuana and knew from Mr. Leal that the informant was interested in buying methamphetamine. The exchange was:

---

[1]    The government argues that *United States v. Anaya*, 727 F.3d 1043 (10th Cir. 2013) eliminated the need to prove Mr. Leal's knowledge that the conspiracy had involved methamphetamine. We need not address this argument because the jury had sufficient evidence to find Mr. Leal's knowledge of the drug type.

> CHS: All right. Did he told you -- did he tell you what I do?
>
> JOSE CASILLAS: Kind of. I think he said something about like you like to hang around with homegirl Crystal.
>
> CHS: Who the fuck is that, Crystal?
>
> JOSE CASILLAS: You know, the stuff that people (inaudible).

Appellee's Supp. App'x vol. 1, at 37. (The call transcript referred to the informant as "CHS" because he was a confidential human source.)

Though Mr. Casillas didn't sell methamphetamine, he was willing to pass along the informant's request. But Mr. Casillas first needed to confirm the quantity of methamphetamine that the informant wanted to buy:

> CHS: -- usually -- usually I -- usually I get two zippers.
>
> JOSE CASILLAS: Two zippers. Okay.

Appellee's Supp. App'x vol. 1, at 38. Mr. Casillas then sent a Facebook message to Ms. Erika Barraza, the girlfriend of Luis Arreola-Palma, who was in jail with Mr. Leal. *Id.*[2]

---

[2]    The presentence report says that Ms. Barraza then sent a text message to the informant. But the government did not present the jury with information about a text message to Ms. Barraza.

## Mr. Leal starts series of communications for the informant to buy methamphetamine



**Legend**

 Provides contact information

 Sends Facebook message

Mr. Arreola-Palma, Mr. Casillas, and Mr. Leal later called the informant to arrange a sale. In that call, Mr. Arreola-Palma told the informant to contact another individual (Mr. Daniel Carmona), who would sell the methamphetamine and collect the money. Mr. Leal added that he expected to be paid, gave the informant the phone number for Mr. Carmona, and told the informant to call the number while they stayed on the phone. The informant said that he couldn't make the call, so Mr. Casillas tried to phone Mr. Carmona while everyone else waited. But Mr. Carmona didn't answer, and the group wrapped up their call. The informant later bought methamphetamine twice from Mr. Carmona, obtaining about two ounces each time.

**2.    Sufficient evidence existed to prove Mr. Leal's knowledge that the sale would involve methamphetamine.**

Mr. Leal ultimately participated in two calls connecting the informant to the seller of methamphetamine (Mr. Carmona). Mr. Leal focuses on the first of these calls. In that call, Mr. Leal told the informant to contact someone who sold only marijuana (Mr. Casillas). Mr. Leal questions how the referral to Mr. Casillas could suggest knowledge that the sale would involve methamphetamine. Mr. Leal's focus on this call overlooks four pieces of evidence:

1.    Mr. Casillas said that he knew from Mr. Leal that the informant wanted to buy methamphetamine.

2.    Mr. Casillas then contacted Luis Arreola-Palma's girlfriend about selling methamphetamine to the informant.

3.    In a group call with the informant, Mr. Leal claimed a fee, gave the informant the phone number for Mr. Carmona, told the informant to call Mr. Carmona, and waited while Mr. Casillas tried to call Mr. Carmona.

4.    The informant then contacted Mr. Carmona and bought methamphetamine from him on two separate days. Each purchase consisted of roughly two ounces (about 56 grams).

Mr. Leal thus participated twice in a series of calls connecting the informant to the person who ultimately sold the methamphetamine.



Though Mr. Leal focuses on the first call, the jury could reasonably have relied on Mr. Leal's later role in connecting the informant to Mr. Carmona. By then, Mr. Casillas had confirmed his understanding from Mr.

Leal that the informant wanted to buy methamphetamine. After confirming that understanding, Mr. Casillas joined Mr. Leal and Mr. Arreola-Palma in a phone call, where they arranged for the informant to buy methamphetamine from Mr. Carmona. The evidence thus sufficed for a finding that Mr. Leal had known that the sale would involve methamphetamine.

**3.    Sufficient evidence existed for the jury to find that Mr. Leal had known the sale would involve at least 50 grams.**

Mr. Leal also argues that the jury could only speculate on his knowledge about the quantity (at least 50 grams). In making this argument, Mr. Leal overlooks three key pieces of evidence:

1.    When talking to Mr. Casillas, the informant said that he usually bought two "zippers" of methamphetamine.

2.    In the phone call between Mr. Leal, Mr. Casillas, Mr. Arreola-Palma, and the informant, Mr. Arreola-Palma told the informant to give the pricing information to Mr. Carmona (that the informant would "give [Mr. Carmona] . . . three for one of them, and the other one after that is four"). Appellee's Supp. App'x vol. 1, at 40. Mr. Leal then stated, "I'm going to get a piece of that . . . ." *Id.*

3.    The informant then called Mr. Carmona and bought methamphetamine from him on two separate days. Each purchase consisted of roughly two ounces.

Some inferences were required for the jury to find that Mr. Leal had known of the informant's desire to buy at least 50 grams. But these inferences were reasonable. Mr. Casillas was told that the informant wanted to buy two "zippers" of methamphetamine at a time. After

9

obtaining this information, Mr. Casillas, Mr. Arreola-Palma, and Mr. Leal connected the informant with Mr. Carmona (the seller). With Mr. Leal on the phone, Mr. Arreola-Palma told the informant what the prices would be for two "of them." Appellee's Supp. App'x vol. 1, at 40. Mr. Leal then claimed a fee.

The government elsewhere presented evidence that (1) "zippers" referred to ounces and (2) one ounce equals about 28 grams. Appellant's App'x vol. 1, at 38, 90, 94, 118. Because the evidence reflected 2 sales of roughly 2 ounces each, the jury could reasonably find that Mr. Leal had known that the conspiracy would involve at least 50 grams of methamphetamine. We thus reject Mr. Leal's challenge to the sufficiency of the evidence.

## II.    The government's conduct in the investigation was not obviously outrageous.

Mr. Leal also claims that the government acted outrageously by using the informant to target Mr. Leal, who was a recently released addict with severe cognitive difficulties.

### A.    Outrageous governmental conduct can require dismissal of the indictment.

The Fifth Amendment's Due Process Clause is violated if the government conducts itself outrageously in a criminal investigation. *United States v. Mosley*, 965 F.2d 906, 908 (10th Cir. 1992); *see United States v. Russell*, 411 U.S. 423, 431–32 (1973). When governmental conduct is

10

sufficiently outrageous, the court must dismiss the indictment. *Mosley*, 965 F.2d at 908. The governmental conduct is outrageous only if it's "shocking" and "clearly intolerable" in light of the totality of the circumstances. *Id.* at 910.

### B.    We review only for plain error.

In district court Mr. Leal did not allege outrageous government conduct, so we review only for plain error. *See United States v. Gell-Iren*, 146 F.3d 827, 831 (10th Cir. 1998) (applying the standard for plain error because the defendant hadn't urged dismissal in district court based on outrageous governmental conduct).[3] To establish plain error, Mr. Leal must

---

[3]    Federal Rule of Criminal Procedure 12(b) requires defendants to assert certain defects—including "a defect in instituting the prosecution"—before trial. Fed. R. Crim. P. 12(b)(3)(A). Five circuits have held that this rule and a prior version would cover allegations of outrageous governmental conduct. *United States v. Nunez-Rios*, 622 F.2d 1093, 1098–99 (2d Cir. 1980) (prior version); *United States v. Salahuddin*, 765 F.3d 329, 349–50 (3d Cir. 2014) (prior version); *United States v. Duncan*, 896 F.2d 271, 274 (7th Cir. 1990) (prior version);*United States v. Warren*, 788 F.3d 805, 811 (8th Cir. 2015) (prior version); *United States v. Mausali*, 590 F.3d 1077, 1080 (9th Cir. 2010) (prior version); *accord United States v. Fernandez Martinez*, 317 F. App'x 929, 934 (11th Cir. 2009) (prior version) (unpublished). And appellants waive Rule 12(b) issues by failing to raise them before trial. *United States v. Vance*, 893 F.3d 763, 769–70 (10th Cir. 2018); *see United States v. Bowline*, 917 F.3d 1227, 1235–37 (10th Cir. 2019) (concluding that the defendant's untimely Rule 12 argument constituted a waiver of the argument). So Mr. Leal might have waived an allegation of outrageous governmental conduct by failing to raise the issue before trial. If Mr. Leal had committed a waiver, we could not review the issue even for plain error. *See Bowline*, 917 F.3d at 1235–37. But the government does not urge waiver of the issue.

show "(1) [an] error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Maynard*, 984 F.3d 948, 966 (10th Cir. 2020) (quoting *United States v. Peña*, 963 F.3d 1016, 1023 (10th Cir. 2020)).

**C.    The district court did not err by failing to sua sponte find outrageous conduct.**

Under the plain-error standard, Mr. Leal must show an error. To do so, he argues that the district court erred by failing to dismiss the indictment in light of the government's outrageous conduct.

To show outrageous conduct, Mr. Leal must prove "either (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime." *United States v. Wagner*, 951 F.3d 1232, 1253 (10th Cir. 2020) (quoting *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013)).[4]

**1.    Mr. Leal has not established excessive governmental involvement.**

Governmental involvement in a crime is excessive when "the government essentially generates new crime for the purpose of prosecuting

---

[4]    Mr. Leal argues that *United States v. Dyke*, 718 F.3d 1282 (10th Cir. 2013), conflicts with *United States v. Mosley*, 965 F.2d 906 (10th Cir. 1992). For this argument, Mr. Leal points to dicta in *Dyke* that focuses on the defendant's willingness to commit the crime rather than the government's conduct. *United States v. Dyke*, 718 F.3d 1282, 1290–91 (10th Cir. 2013). That dicta does not affect our analysis.

it or induces a defendant to become involved for the first time in certain criminal activity, as opposed to merely interposing itself in an ongoing criminal enterprise." *United States v. Mosley*, 965 F.2d 906, 911 (10th Cir. 1992). Though it would be outrageous for the government to "engineer and direct the criminal enterprise from start to finish," it is not outrageous for the government to

- "infiltrate an ongoing criminal enterprise,"

- "induce a defendant to repeat or continue a crime,"

- "induce [a defendant] to expand or extend previous criminal activity," or

- "suggest the illegal activity."

*Id.* (cleaned up); *see United States v. Sneed*, 34 F.3d 1570, 1577 (10th Cir. 1994). Mr. Leal did not present evidence that the government had "engineer[ed] and direct[ed]" the methamphetamine purchases. *Mosley*, 965 F.2d at 911.

Mr. Leal alleges that the government "manufactured" the conspiracy, relying on the informant's statement that he "put deals on the table" as part of his job. Appellant's App'x vol. 1, at 100. The informant arguably put a deal on Mr. Leal's table by asking about the possibility of buying drugs. But "[t]he government, as a part of a sting operation, can suggest or initiate illegal activity." *United States v. Sandia*, 188 F.3d 1215, 1219

(10th Cir. 1999). So the informant's question about drugs wouldn't constitute outrageous conduct.

Mr. Leal responded to the informant by providing him with the contact information for Mr. Casillas, who in turn referred the sale to Mr. Arreola-Palma's girlfriend. Mr. Arreola-Palma and Mr. Leal then participated in a call where Mr. Leal

- told the informant how to contact someone who could sell the methamphetamine (Mr. Carmona),

- waited for Mr. Casillas to call Mr. Carmona, and

- claimed a fee.

Though the informant may have induced Mr. Leal to extend his criminal activity, the government did not create a new crime.

### 2.     Mr. Leal has not established significant governmental coercion.

Coercion exists only if the government's conduct is "particularly egregious." *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994). Mr. Leal argues exploitation of his vulnerability, pointing to his mental illnesses, intellectual deficits, and drug addiction. To prevail on a coercion theory, however, Mr. Leal must show that the government knowingly took advantage of his vulnerability. *See United States v. Mosley*, 965 F.2d 906, 914 (10th Cir. 1992) (rejecting the defendant's argument that the government's conduct was coercive in light of the defendant's addiction

14

when the defendant presented no evidence that the government had known of the defendant's addiction).[5]

Mr. Leal does not suggest that the government knew of his mental illnesses, intellectual deficits, or drug addiction. Indeed, none of the law-enforcement agents interacted with Mr. Leal. And there was no evidence suggesting that the informant had suspected mental illness or cognitive difficulty. The district court thus had no reason to inject a sua sponte finding of significant governmental coercion.

**D.      Even if the district court had erred in declining to sua sponte order dismissal of the indictment, the error would not have been plain.**

An error is "plain" if it "is clear or obvious under current, well-settled law." *United States v. Miller*, 978 F.3d 746, 763 (10th Cir. 2020) (quoting *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012) (internal quotation marks omitted)). An error is generally contrary to well-settled law only if the Supreme Court or our court has addressed the issue. *United States v. Peña*, 963 F.3d 1016, 1023 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 1120 (2021).

---

5      Mr. Leal also says that the government knew of his recent release from prison. But he does not explain the significance of his recent release. So we address only whether the government knew of Mr. Leal's mental illnesses, intellectual deficits, or drug addiction.

**1.    The court did not clearly or obviously err by failing to sua sponte require additional evidence on Mr. Leal's mental conditions.**

In urging an obvious error, Mr. Leal points to his expert witness's diagnoses of mental conditions.[6] But the expert witness presented these diagnoses in the sentencing phase—after the jury had already found Mr. Leal guilty. So in the guilt stage, the district court couldn't have known of these diagnoses. And regardless of what the court understood, it had no reason to suspect that law-enforcement officers had knowingly exploited Mr. Leal's mental illnesses. None of the government's employees had ever

---

[6]    These conditions were

- unspecified schizophrenia spectrum and other psychotic disorders,

- generalized anxiety disorder,

- opioid use disorder in forced remission,

- cannabis use disorder in forced remission,

- posttraumatic stress disorder,

- borderline intellectual functioning, and

- depressive disorder not-otherwise-specified.

16

interacted with Mr. Leal, and the guilt stage contained no mention of Mr. Leal's mental conditions.

Given the lack of such evidence, Mr. Leal seeks a remand for factual development about what the informant knew. The request for a remand suggests recognition that the district court had no reason to suspect governmental awareness of Mr. Leal's mental illnesses. Given the lack of such evidence, the district court couldn't have committed an obvious error by failing to sua sponte dismiss the indictment for outrageous conduct.[7]

**2.     The district court did not clearly or obviously err by failing to sua sponte find outrageous conduct in paying the informant.**

Mr. Leal argues that using a highly paid informant was outrageous. Paying an informant does not itself constitute outrageous conduct. *United States v. Gell-Iren*, 146 F.3d 827, 831 (10th Cir. 1998). Though the government can pay informants, Mr. Leal insists that the amount ($125,000) was exorbitant. But that amount had been spread over a period of almost 7 years (October 2012 to July 2019); the payments to the informant averaged only about $17,900 per year.

---

[7]     Mr. Leal points out that the Ninth Circuit ordered a remand in *United States v. Bogart*, 783 F.2d 1428 (9th Cir. 1986). There, however, the defendant had presented the district court with a claim of outrageous conduct. *Id.* at 1433. The Ninth Circuit ordered a remand because the district court had rejected this claim without making any factual findings. *Id.* at 1434. The Ninth Circuit didn't suggest a need to remand for development of a record on a claim newly asserted in the appeal.

Viewed together, the circumstances do not render the government's conduct obviously outrageous. The government paid the informant, but there's nothing to suggest that these payments were contingent on the results. To the contrary, the government paid the informant for some investigations that had ended without any prosecutions. And after expressing an interest in buying drugs, the informant just waited. While he waited, Mr. Leal initiated a series of conversations that resulted in 2 sales, totaling roughly 4 ounces (112 grams) of methamphetamine. The government's conduct was thus not obviously outrageous.

## III.    Mr. Leal's sentence is not substantively unreasonable.

Mr. Leal argues that his sentence of 30 years was substantively unreasonable. We disagree.

### A.    We consider the reasonableness of the sentence for abuse of discretion.

This court reviews sentences for reasonableness. *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009); *United States v. Booker*, 543 U.S. 220, 261–62 (2005). In this review, we apply the abuse-of-discretion standard, *Gall v. United States*, 552 U.S. 38, 41 (2007), vacating the sentence only if the district court acted arbitrarily, capriciously, whimsically, or in a way that was "manifestly unreasonable," *United States*

18

*v. Lawless*, 979 F.3d 849, 855 (10th Cir. 2020) (quoting *United States v.*

*Peña*, 963 F.3d 1016, 1024 (10th Cir. 2020)).

>    **B.    The district court's sentence is presumptively reasonable.**

Mr. Leal's offense level and criminal history led to a guideline range

of 30 years to life. Because Mr. Leal's sentence fell within this range, we

presume that the sentence was reasonable. *United States v. Ibanez*, 893

F.3d 1218, 1219 (10th Cir. 2018).

Mr. Leal tries to rebut this presumption by arguing that

- his sentence was excessive compared to the sentences of his codefendants (Mr. Daniel Carmona and Mr. Luis Arreola-Palma),[8]

- the harshness of Mr. Leal's sentence was designed to penalize him for going to trial, and

- his sentence failed to account for his mental conditions.

These arguments don't undercut the reasonableness of the sentence.

---

[8]    In oral argument, Mr. Leal also argued that his sentence was excessive compared to the sentences of codefendants in a separate case (Ms. Bernadette Tapia, Ms. Candace Tapia, and Mr. Brandon Candelaria). But in his appeal briefs, Mr. Leal never mentioned the sentences of those defendants or compared those sentences to his.

We don't consider arguments for reversal that are newly asserted in oral argument. *Marks v. Colo. Dep't of Corrs.*, 976 F.3d 1087, 1099 (10th Cir. 2020).

**1.    The sentence disparities came from a mandatory minimum, different criminal histories, and adjustment for acceptance of responsibility.**

The codefendants (Mr. Carmona and Mr. Arreola-Palma) accepted plea agreements and obtained prison sentences of 5 years and 4 years. Mr. Leal obtained a much harsher sentence (30 years).

This disparity alone is not enough to rebut the presumption of reasonableness. "[T]he purpose of the Guidelines is not to eliminate disparities among codefendants, but rather to eliminate disparities among sentences nationwide." *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008). Unlike the codefendants, Mr. Leal was convicted of a charge triggering a mandatory minimum prison term of 10 years. *See* 21 U.S.C. § 841(b)(1)(A)(vii).[9] And his status as a career offender increased his guideline range's

- floor from 262 months to 30 years and

- ceiling from 327 months to life imprisonment.

_____

[9]    The two codefendants had been indicted for conspiracy to distribute at least 50 grams of a mixture containing methamphetamine. But they entered plea agreements, and the government dropped this charge. Mr. Carmona pleaded guilty only to using and carrying a firearm during a drug trafficking crime, which carried a mandatory minimum of five years, not ten years. 18 U.S.C. § 924(c)(1)(A)(i). And Mr. Arreola-Palma pleaded guilty only to a subsequent Information, which omitted any reference to the quantity of methamphetamine. That omission removed Mr. Arreola-Palma's exposure to a mandatory minimum. *See Alleyne v. United States*, 570 U.S. 99, 114–16 (2013) (concluding that a defendant can't be subject to a mandatory minimum based on an aggravating fact unless the aggravating fact is proven to a jury).

20

We addressed a similar issue in *United States v. Haley*, 529 F.3d 1308 (10th Cir. 2008). There the defendant's prison sentence was 262 months, and a codefendant's sentence was only 18 months. *Id.* at 1309. The defendant argued that the sentence was substantively unreasonable because the codefendant had been more culpable. *Id.* at 1312. We rejected this argument because

- the defendant was a career offender and the codefendant wasn't and

- the district court could assign greater weight to the defendant's status as a career offender than to the codefendant's greater culpability.

*Id.*

Under *Haley*, the district court didn't abuse its discretion. Unlike the codefendants, Mr. Leal was a career offender, putting his guideline range at six times or more the sentence for either codefendant. And the mandatory minimum required the court to sentence Mr. Leal to at least ten years: twice Mr. Carmona's sentence and almost three times Mr. Arreola-Palma's.

**2.     Mr. Leal's sentence did not constitute a penalty for going to trial.**

Mr. Leal also argues that the sentencing disparity shows an intent to penalize him for going to trial. We reject this argument.

21

Both codefendants pleaded guilty before trial, triggering downward adjustments for acceptance of responsibility. *See* U.S.S.G. 3E1.1(a). In exchange for these guilty pleas, the government voluntarily dismissed some of the charges.

Upon those dismissals, Mr. Carmona pleaded guilty to unlawful possession of a firearm, which carried a minimum prison term of five years. 18 U.S.C. § 924(c)(1)(A)(i). The parties jointly proposed a five-year sentence and the court agreed, sentencing Mr. Carmona to the statutory maximum of five years.

Mr. Arreola-Palma pleaded guilty to conspiracy. The parties jointly proposed a four-year sentence, and the court agreed.

Unlike these codefendants, Mr. Leal didn't stipulate to any of the elements of the conspiracy charge. So he didn't qualify for a downward adjustment based on acceptance of responsibility. *See* U.S.S.G. § 3E1.1(a). Because Mr. Leal didn't qualify for the downward adjustment, the court didn't penalize him for going to trial. *See United States v. Peña*, 963 F.3d 1016, 1027 (10th Cir. 2020) (concluding that the district court didn't penalize the defendant for going to trial when he didn't stipulate to any elements); *see also United States v. Tennison*, 13 F.4th 1049, 1062 (10th Cir. 2021) (concluding that the district court didn't abuse its discretion by issuing a longer sentence to the defendant than to a codefendant who had

22

"accepted responsibility for her actions and cooperated with the government").

Unlike Mr. Leal, the codefendants obtained not only the downward adjustments for acceptance of responsibility but also prosecutorial concessions through plea negotiations.[10] Charging decisions are made by the prosecutor, not the court. *United States v. LaBonte*, 520 U.S. 751, 762 (1997). And these charging decisions necessarily affect the district court's sentencing discretion. *United States v. Robertson*, 45 F.3d 1423, 1438 (10th Cir. 1995). So the prosecutor's charging decisions don't undermine the reasonableness of sentencing disparities among codefendants. *See United States v. Perez-Pena*, 453 F.3d 236, 244 (4th Cir. 2006) (stating that the court has "no reason to believe that Congress intended that sentencing disparities between defendants who benefitted from prosecutorial discretion and those who did not could be 'unwarranted' within the meaning of [18 U.S.C.] § 3553(a)(6)").

---

[10] Though Mr. Leal complains of disparities for the sentences imposed on Mr. Carmona and Mr. Arreola-Palma, our record doesn't contain the materials for those sentences. But we can take judicial notice of these documents. *See United States v. Duong*, 848 F.3d 928, 930 n.3 (10th Cir. 2017) (taking judicial notice of filings in a related case).

**3.    The district court didn't fail to consider Mr. Leal's mental conditions.**

Mr. Leal's opening brief includes a single sentence on the impact of his mental conditions: "Mr. Leal's extremely low mental functioning and his severe psychological problems . . . warrant a lighter sentence under § 3553(a)." Appellant's Opening Br. at 44. Given Mr. Leal's failure to explain this assertion, it was inadequately developed. *See Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 n.3 (10th Cir. 2008) (stating that a single fleeting sentence in an appellate brief "is too inadequately developed to be meaningfully addressed and is deemed waived").

Even if this assertion had constituted a distinct argument, however, we would reject it because the court acted reasonably when considering Mr. Leal's mental conditions. The court acknowledged that

- Mr. Leal was illiterate, had suffered from abuse and trauma, had borderline functioning, had suffered intellectual deficiencies and psychosis; and

- these conditions had put downward pressure on the sentence.

But the court concluded that Mr. Leal's mental conditions did not justify a variance below the guideline range. For this conclusion, the court pointed out that

- Mr. Leal had committed some of the crimes while he was in prison and

- many victims of abuse and trauma don't commit these crimes.

Mr. Leal does not identify any flaws in the district court's analysis of Mr. Leal's mental conditions. *See Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) (stating that the appellant must "explain what was wrong with the reasoning that the district court relied on in reaching its decision").

## IV.    Conclusion

The jury had sufficient evidence to find a conspiracy to distribute at least 50 grams of methamphetamine, the government did not obviously commit outrageous conduct, and the sentence of 30 years was not substantively unreasonable. We thus affirm the conviction and sentence.